Lulu Ursprung, an Infant, by Louis Ursprung, Her Guardian ad Litem, Respondent, v. The Winter Garden Company, Incorporated, and Floyd Grant & Company, Incorporated, Appellants, Impleaded with Amos Maynard Lyon and Others, Defendants.

Louis Ursprung, Respondent, v. The Winter Garden Company, Incorporated, and Floyd Grant & Company, Incorporated, Appellants, Impleaded with Amos Maynard Lyon and Others, Defendants.

First Department, March 15, 1918.

Master and servant — negligence — injury to person employed as dancer by fall down elevator shaft maintained by employer — evidence justifying recovery — use of premises for manufacture of theatrical costumes — such use is manufacturing — negligence of defendant in failing to build door to elevator shaft so that it can be opened only from within — charge examined and approved — when lessor of premises not liable.

The plaintiff, a girl nineteen years of age, who was employed by the defendant as a dancer in its theatre, was sent to an adjoining building leased by the defendant to be fitted with a costume, and when leaving the premises, with which she was unfamiliar, failed to use the door through which she entered an adjoining room which was dimly lighted, but opened another door leading to an elevator shaft down which she fell. Evidence examined, and *held*, that the question of the contributory negligence of the plaintiff in failing to leave by the route by which she came was properly submitted to the jury who were warranted in finding that she exercised such care as an ordinarily prudent person of her age in her circumstances would have exercised.

It was not error for the court to refuse to charge that under the circumstances the plaintiff was under the duty as a matter of law to make inquiry as to the route she should take in leaving the building before proceeding, the court having left that question to the jury.

Where the lease under which the defendant held the premises required it to make all repairs and comply with all statutes, ordinances, rules and regulations of the Federal, State and city governments and of any and all of their departments and bureaus, etc., and also entitled the defendant to the use of the elevator, which the defendant altered by boarding up the shaft and putting in a new door, it was proper for the court to charge in substance that the jury could find the defendant negligent if the door was not kept closed as required by the Building Code of the city of New York and regulations adopted thereunder and by the provisions of the Labor Law and the rules adopted by the Department of Labor.

*It seems,* that a violation of said statutory provisions and regulations does not constitute conclusive evidence of negligence.

An allegation in the complaint that the premises were used by the defendant for manufacturing is sufficiently established where it appears that they were used to manufacture theatrical costumes for the defendant under the direction of a person who was paid a salary for such work.

In such action it was proper to allow the plaintiff to introduce in evidence a rule adopted by the Industrial Commission which required doors on elevators of the type aforesaid to be provided with devices which will insure the door being locked before the elevator car can start from a landing, it appearing that the door installed by the defendant could only be locked on the outside of the shaft so that there was no compliance with said regulations of the Commission.

Even if the door was erected by the defendant before said regulation went into effect it became the defendant's duty to change it to conform to the regulation.

*It seems,* that the superintendent of buildings had authority to require the doors of elevator shafts to be closed or bolted on the shaft side so as to be opened only from within the elevator.

In any event the fact that the superintendent of buildings had no power to make such requirements is immaterial, where it was in effect the same as the regulations prescribed by the Industrial Commission. Since one lawful regulation unquestionably required such door to be locked from within the shaft the defendant was not prejudiced even if the court erred in charging that another regulation also required it.

Under the proof it was proper for the court to charge that the defendant conducted a factory on the premises within the Labor Law which required all openings leading to elevators to be kept well lighted at all times during working hours.

The aforesaid laws and regulations were not enacted solely for the benefit of persons working in such factory, but inured to the benefit of all employees of the defendant lawfully on the premises in the discharge of their duties.

A codefendant who sublet the premises to the defendant theatre company and continued to occupy other portions of the building, but which was ignorant of the fact that the premises were used by the defendant for factory purposes, cannot be charged with liability for the injuries received by the plaintiff and a verdict against such codefendant cannot stand.

SEPARATE APPEALS in each case by the defendants, The Winter Garden Company, Incorporated, and another, from judgments of the Supreme Court, one in each action, entered in the office of the clerk of the county of New York on the 29th day of May, 1917, upon the verdict of a jury, and also from orders entered in said clerk's office on the 31st day of

May, 1917, denying defendants' motions for a new trial in each case made upon the minutes.

The verdict of the jury in the first case was for $15,000, and in the second was for $4,561.75.

*Frederick W. Catlin* of counsel [*Robert H.. Woody*, attorney], for the appellant The Winter Garden Company, Incorporated.

*Morris Weiss* [*Leonard F. Fish* of counsel], for the appellant Floyd Grant & Company, Incorporated.

*Sydney A. Syme,* for the respondents.

LAUGHLIN, J.:

The actions are to recover damages for alleged negligence, from which the plaintiff in the first action, Lulu Ursprung, sustained personal injuries on the 10th day of September, 1915. The second action is by her father to recover the damages sustained by him in consequence of the injuries to his daughter, who was nineteen years of age. No question is presented by either appeal with respect to the amount of damages. For brevity, therefore, the daughter will be referred to as the plaintiff.

The plaintiff was desirous of obtaining a position as chorus girl and dancer at the Winter Garden Theatre, and at the suggestion of Mr. Jacob J. Shubert, the president of the Winter Garden Company, she took dancing lessons preparatory therefor, and thereafter and for about six weeks prior to the day of the accident she had been rehearsing at the Winter Garden Theatre for the show known as the "World of Pleasure." As was customary, she furnished her own clothes for rehearsal. On the day of the accident she and other girls had been rehearsing in the morning and afternoon, and at about five P. M. the dancing instructor, who had been coaching them, read from a list handed to him by Mr. Shubert, who had witnessed the rehearsals, the name of the plaintiff and the names of five or seven other girls selected to appear in the show, and they were directed to go upstairs to be fitted for costumes. The rehearsals had been at the Winter Garden Theatre at the northeasterly corner of Broadway and Fiftieth street, in the borough of Manhattan, New York. One Lyon

owned the building adjoining the theatre on the north and extending to West Fifty-first street and from Broadway to Seventh avenue, the third or upper floor of which was substantially on a level with the roof of the theatre; and on the 3d of April, 1911, he leased said third floor to Floyd Grant for the period of five years from the first of May thereafter. On the 28th of April, 1913, Grant sublet the premises to the Winter Garden Company for the balance of the term at an increased rental. At the time of the accident and for some time prior thereto, the Winter Garden Company used said third floor, among other things, for making, fitting and storing costumes. The plaintiff had never been to the fitting room, but some of the other girls had appeared in other shows at the Winter Garden Theatre and knew and led the way, and she followed. The way led up several flights of stairs behind the scenes in the theatre, to and across the roof, to a door which led into a room on the third floor of Lyon's building, known as the mechanic's room, from which a door led into a room known as the wardrobe room, in which there were costume racks and costumes; and from a passageway in that room between the costume racks a door led into a large room known as the shop, which extended the entire width northerly and southerly of Lyon's building, and in which there were six or seven cutting tables, eight motor-driven sewing machines and two embroidering machines; and on passing through this room they came to the fitting room, which was in the Broadway and West Fifty-first street corner of the shop room. The plaintiff was fitted last. A companion waited to return with her, but all the others had returned. On returning through the room known as the shop, the plaintiff and her companion took a more southerly route, passing to the south of tables which, on entering, they had passed northerly of, and approached the partition between the wardrobe room and the shop room at a point about eleven feet southerly of the door through which they had entered, at which point, however, there was another door through the partition, and they passed out through it. The two doors were alike in appearance with the exception that they opened in opposite directions. The other girl could not be located and her testimony was not

taken. The testimony of the plaintiff is to the effect that they supposed they were leaving the shop room through the same door by which they had entered it; that the room they entered on leaving the shop room was somewhat dark, but that as they entered it a door was observable some twenty feet distant in a partition at the right; that they passed on to this door, on the assumption that it was the door through which they had entered; that it opened inwardly toward them, and she thought it was partly open; that her companion took hold of the knob or other hold on the door and further opened it wide, and she stepped into the opening, and, recalling that they stepped up two steps in passing from the mechanic's room into the wardrobe room, and thinking that this was the same place, she put her foot forward and with it felt for a step; that it was so dark she could not see anything and that she fell into the opening, which was the hoistway of an elevator, and sustained the injuries. The plaintiff says that as they passed through the wardrobe room on the way in, there was no difficulty in seeing, but that the costume racks and costumes tended to darken it. There were two electric lights in the room from which the door opened into the elevator shaft, but they were not lighted at the time of the accident. A woman in charge of the wardrobes testified that the wardrobe room was light when the girls went through on entering, and that she left the door between that room and the shop room open so that they might come back that way, and was standing in the wardrobe room into which the door opened, holding it open while about four of the girls passed out, and that later while she was so standing there she saw two young ladies come running along the hall or aisle from the fitting room as though they were excited, and that one of them was putting a middy blouse over her head, and that instead of coming to her door they must have gone to the other door near the elevator shaft, for she heard a scream shortly thereafter.

It is contended in behalf of each appellant that the plaintiff was guilty of contributory negligence in failing to return from the shop room by the door through which she had entered it and in not retracing her steps when she encountered the darkness at the elevator shaft. We are of opinion that those

questions were properly left to the jury. These girls were naturally elated over having been selected for employment in their chosen vocation, and the jury were fairly warranted in finding that the plaintiff exercised such care as an ordinarily prudent person of her age and in her circumstances would have exercised. The door through which they entered the shop room and the one through which they left it appeared to be alike and were so near together that it cannot be said as matter of law that the plaintiff should have known that she was not leaving by the same door by which she had entered. She received no special instructions and no warning of danger. She had a right to return and, according to her testimony, believing that she was returning by the same route and that the passageway was safe, she was exercising all reasonable care. The evidence on that branch of the case fairly sustains the verdict. Counsel for appellants, however, contend that the jury were not properly instructed with respect to the duty devolving on the plaintiff. The court was requested to charge, " that if the plaintiff knew or by the exercise of reasonable care should have known when she passed through the door indicated as number five on the diagram into the small, semi-dark room, that she was not returning by the same route she had gone to the fitting room, that it was her duty to make some inquiry or use care to ascertain where she was before proceeding." With respect to this request the court said: " You mean her duty as a matter of law to make inquiry? " and counsel answered in the affirmative, to which the court replied: " I decline so to charge. What her duty was is for the jury to say." An exception was taken to the refusal of the court to charge as requested and to the modification. It is contended that the effect of these instructions was to leave it to the jury to determine what the plaintiff's duty was; but manifestly such was not the intention of the learned judge, and it is evident that the instructions would not be so understood by the jury. It is perfectly plain that the court merely meant that whether she should in those circumstances have made inquiry or used further care to ascertain where she was before proceeding, was for the jury to determine.

The case was not submitted to the jury with respect to

either of the appellants on any theory of liability at common
law, although there was a duty at common law on the part
of the employer to furnish the plaintiff a reasonably safe
passageway. They have both been held liable on the theory
that they were guilty of negligence in failing to comply with
certain provisions of the Building Code, of the Labor Law and
of regulations made by legislative authority. The owner,
Lyon, and his lessee, Grant, were joined as defendants but they
died before the trial, and the actions abated as to them.
Some of the points concerning the liability of the Winter
Garden Company relate to changes made in the elevator
shaft at the third floor after it became lessee. By the lease
of the third floor from the owner to Grant, the tenant agreed
to keep the premises in good repair, and it was therein pro-
vided that all improvements made by the tenant should
belong to the landlord, and the tenant agreed that he would
not make any alterations in the building and that he would
promptly comply with all lawful orders and regulations of
the board of health and police department and of the city,
and would make inside and outside repairs at his own cost
and expense, and that the landlord should contribute $100
toward the installation of an electric elevator, but that all
running charges thereof should be borne by the tenant.
The sublease from Grant to the Winter Garden Company
provided that the latter should at its own expense make all
repairs and promptly execute and comply with " all statutes,
ordinances, rules, orders, regulations and requirements of the
Federal, State and City Government, and of any and all
their Departments and Bureaus applicable to said premises,
for the correction, prevention and abatement of nuisances or
other grievances in, upon or connected with said premises
during said term; and shall also promptly comply with and
execute all. rules, orders and regulations of the New York
Board of Fire Underwriters for the prevention of Fires, at
their own cost and expense," but Grant reserved the right
to enter the premises " for the purpose of examining the same
or making such repairs or alterations therein as may be neces-
sary for the safety and preservation thereof." It was further
provided that the Winter Garden Company should at all
times " have the use of the freight elevator." After Grant

sublet to the Winter Garden Company and on the 15th of July, 1915, which was less than two months before the accident, he assigned his lease from the owner to the Floyd Grant Company, Incorporated. One Vogel, the vice-president of the Grant Company, testified that when Grant leased to the Winter Garden Company the elevator at the third floor was boarded up by slats about three inches apart and that the entrance to the elevator was on the easterly side facing Seventh avenue, and that at the entrance there was a double gate on hinges, and that there was a large window opening into the elevator shaft, and that the Winter Garden Company divided the loft into two parts by a partition and made a separate hall, and boarded up and cased in the entire elevator shaft, closing the door and window, and put in a new door facing Fifty-first street. His testimony shows that he did not see these changes made, but he was permitted to testify in substance that the changes were made by the Winter Garden Company, and he was not cross-examined, and no other evidence was offered on the subject. It is fairly to be inferred, therefore, that the changes were made by the Winter Garden Company.

One point argued by counsel for the Winter Garden Company does not appear to have been raised on the trial. It is now contended that the evidence does not sustain the allegations of the complaint with respect to the location of the elevator shaft, and that the complaint charged, in effect, that the plaintiff fell into the elevator shaft as she stepped through the door from the shop room. The allegations of the complaint are susceptible of that construction, but the appellant could not have been misled thereby as it knew that such was not the fact, and the evidence showing that the plaintiff, after passing through that door, passed through another door some twenty feet distant therefrom leading into the elevator shaft, was received without objection. If the point now made had been raised on the trial the complaint could have been amended in this regard, and in the circumstances it will be deemed amended to conform to the proof. The elevator was operated by pulling a cable. There was no regular operator in charge, and it is to be inferred from the evidence that those using the elevator operated it. It appears that the elevator was used by the Winter Garden Company in bringing up wardrobe

trunks containing its costumes which had been used by the Shubert Company.

The violation of provisions of the Building Code and of the régulations adopted by the superintendents of buildings of the several boroughs of the city of New York, and of provisions of the Labor Law, and of rules adopted by the Industrial Board of the Department of Labor of the State, was duly charged in the complaint. Section 95 of the Building Code required that the openings through and upon each floor of the building with respect to such an elevator, not inclosed by brick walls or other fireproof material and provided with fireproof doors, should be "provided with and protected by a substantial guard or gate and with such good and sufficient trap-doors as may be directed and approved by the Department of Buildings," and that the guards or gates should.be kept closed at all times when not in actual use. (See Cosby's Code Ord. [Anno. 1914] pp. 217, 218, § 95.) The court charged that the door to the elevator constituted a sufficient gate or guard, but left it to the jury to determine on the testimony of the plaintiff to which reference has been made whether it was closed and, in effect, instructed the jury that it was the duty of the Winter Garden Company to keep it closed, and that if it failed so to do, that constituted *some* evidence of negligence. With respect to this and the other statutory provisions and the regulations made by officials pursuant to statutory authority, the learned court, however, carefully refrained, and I think rightly, from instructing the jury that a violation thereof gave a cause of action or constituted conclusive evidence of negligence within the rule stated and applied in *Willy* v. *Mulledy* (78 N. Y. 310) and *Amberg* v. *Kinley* (214 N. Y. 531), and charged that if the evidence showed a violation of any of the statutory provisions or regulations, which the court ruled were applicable, the jury might find negligence. The charge in that regard was correct under the general rule recognized in the two decisions cited and fully discussed and applied by this court and the Court of Appeals in *Racine* v. *Morris* (136 App. Div. 467; affd., 201 N. Y. 240). The learned counsel for the Winter Garden Company contends that this section of the Building Code was not applicable, and that the evidence with respect to the door

being opened was insufficient to present a question of fact for the jury. The argument that the statute is not applicable is based on an erroneous construction thereof. Counsel argues that trapdoors can only be constructed in uninclosed elevators; but however that may be, we have no question of trapdoors here. The point is that since this elevator shaft was not inclosed in brick walls with fireproof doors it was required to be protected by guards or gates. The court deemed the door a sufficient protection, but on conflicting evidence properly left it to the jury to determine whether or not it was kept closed.

In the lease from the owner to Grant the premises are described as the " top loft," but the covenant with respect to use does not in express terms limit the use to the purpose of a loft, but I think that is its effect. The tenant covenanted that he would not occupy the premises " for any other purpose than as —— or occupy or permit the same to be occupied for any other business or purpose deemed extra hazardous on account of fire " under penalty of forfeiture. While no *use* is here stated it is plainly to be inferred that use as a loft specified in the description of the premises was intended. The lease from Grant to the Winter Garden Company, however, expressly provided that the premises should be used and occupied " as a storage for costumes." For a time the Winter Garden Company sublet part of the top floor to a copartnership firm engaged in manufacturing costumes for it. The copartnership was dissolved but the manufacturing of the costumes was continued on the same basis, except that the rent was reduced, at the same place by the defendants Mahieu and Hilliare Mahieu & Company, Incorporated — as to whom the complaint was dismissed — or by the latter until about the middle of August, 1915, when a new arrangement was made by which the work of manufacturing the costumes was continued by Mahieu on a salary basis until after the accident. The manufacturing of costumes on that floor at the time of the accident, therefore, was, in effect, conducted by the Winter Garden Company, and it used the machines and tables in making costumes not only for the Winter Garden shows but for the other Shubert productions as well, and employed at times forty people in doing the work. The complaint charged that

part of the premises were used for manufacturing and that one or more persons were employed at labor therein. Section 2 of the Labor Law (Consol. Laws, chap. 31 [Laws of 1909, chap. 36], as amd. by Laws of 1913, chap. 529; Laws of 1914, chap. 512, and Laws of 1915, chap. 650)* defines a "factory" as including, among other things, "any mill, workshop, or other manufacturing * * * establishment * * * where one or more persons are employed at labor," and, in effect, defines "manufacturing" as including, among other things, "making, altering, repairing, finishing, * * * in whole or in part," with certain exceptions not in point. (See Laws of 1917, chap. 694, amdg. said § 2.) Section 20-b of the Labor Law (as added by Laws of 1913, chap. 145) provides, among other things, that all factories shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, safety and health of all persons employed therein, and that the industrial board shall from time to time make rules and regulations to that end. Section 51-a (as added by Laws of 1915, chap. 674) authorized the Industrial Commission to make, amend and repeal rules and regulations for carrying into effect the provisions of the Labor Law, and expressly conferred authority on the Commission to make, amend and repeal rules and regulations with respect to the construction, alteration, equipment and maintenance of factories with a view, among other things, to guard against and minimize personal injuries, and to having, among other things, factories constructed, equipped, arranged, operated and conducted so as to provide reasonable and adequate protection to the lives, health and safety of persons employed therein "and frequenting the same," and that the rules and regulations made by the Commission should have the force and effect of law. Section 52 (added by Laws of 1913, chap. 145, as amd. by Laws of 1915, chap. 674) provides that the rules and regulations of the Commission shall constitute the Industrial Code and provides for public hearings before the adoption or amendment or repeal and for the publication thereof. Sections 52-a and 52-b provide for reviews of the action of the Commission. (See Laws of 1915, chaps. 674, 719.) Section 52-c (as added by Laws of 1915, chap. 674)

---

* Since amd. by Laws of 1917, chap. 694.— [REP.

provides, among other things, that the rules and regulations made by the Commission shall be deemed valid and in full force and effect unless reviewed and reversed or annulled by the Commission or by the court as therein provided, and that no court shall have jurisdiction to review, reverse or annul or to enjoin, restrain or interfere with the enforcement of the rules and regulations otherwise. Section 79 of the Labor Law (as amd. by Laws of 1913, chap. 202, and Laws of 1914, chap. 366), as it existed at the time of the accident, provided, among other things, that every hatchway, hoistway or wellhole used for carrying passengers or employees or for freight elevators should be protected on all sides at each floor by substantial vertical inclosures, and that all openings in such inclosures should be provided with self-closing gates of suitable height or with properly constructed sliding doors, and contains an alternative provision by which hatchways used for freight elevator purposes may be provided with trapdoors so constructed as to form a substantial floor surface when closed, and so arranged as to open and close by the action of the car, but that in addition to trapdoors the hatchway should be adequately protected on all sides at all floors by a substantial railing or other vertical inclosure at least three feet in height. Subdivision 5 of that section provides as follows: " The Industrial Board shall have power to make rules and regulations not inconsistent with the provisions of this chapter regulating the construction, guarding, equipment, maintenance and operation of elevators and all parts thereof, and all machinery connected therewith and hoistways, hatchways and well-holes, in order to carry out the purpose and intention of this section." Pursuant to this statutory authority the Industrial Board adopted rules and regulations which became effective on the 15th of April, 1915. Rule 408 provides that hinged or swinging gates or doors may be used for a passenger or freight elevator, but that such gates or doors should be manually operated or selfclosing, and that when manually operated they should be provided with electric contact, or such other devices approved by the Commissioner of Labor " as will insure the gates or doors being closed and locked before the car can start from the landing," and that " Keys shall be available for unlocking such gates or doors from the

outside in emergency cases." Counsel for the Winter Garden Company objected to the reception of this rule in evidence, and contends that it did not apply, for this was not a factory, and that in any event it did not apply to the sublessee of a floor, and that it was only intended for the protection of those using the elevators. The court instructed the jury that it applied to the Winter Garden Company, it appearing that the Winter Garden Company reconstructed the inclosure of the elevator shaft at this floor and, instead of installing gates or doors as required by the rule, erected a swinging door opening and closing, not from the elevator shaft but from the outside, and secured only by a bolt on the outside. That was not a compliance with the regulation of the Commission, to which I think the Winter Garden Company was subject in making these changes. It was not shown whether the changes made by the Winter Garden Company were made before or after this regulation was adopted, but the regulation was not objected to on that ground. If it had been, the evidence might have been supplied. But if the door had been erected before, I think it was the duty of the Winter Garden Company to change it to conform to this requirement, as it was conducting a factory there and using and evidently had control of the operation of the elevator at that floor. Paragraphs 8 and 24 of the regulations governing the construction, inspection and operation of elevators in the borough of Manhattan, adopted at a conference of the superintendents of buildings of the State, and which became effective on the 1st of September, 1911, was received in evidence over objection duly taken by the appellants on the ground that the enactment thereof was not authorized. Paragraph 8 provides that all doors or gates leading to an elevator shaft shall be closed or bolted on the shaft side so as to be opened only by the operator of the car, and that they should be closed before the car is put in motion. Paragraph 24 provides that any infraction of or failure to comply with these regulations after due notice from the superintendent of buildings shall be deemed a violation of the Building Code and subject the owner to the penalties prescribed in section 150 thereof.* By paragraph 1 thereof

---

* See Cosby's Code Ord. (Anno. 1914) p. 262, § 150; Id. (Anno. 1915) p. 140, § 654; Id. (Anno. 1917) p. 165, § 654.— [REP.

the regulations were made applicable to hand-power elevators having a rise of more than thirty-five feet. This was such an elevator. The court charged that paragraph 8 was applicable to the Winter Garden Company. No statute is cited conferring authority on the State Superintendents of Buildings to make such regulations. They were, however, certified by the superintendent of buildings to have become effective in the borough of Manhattan on the 1st of September, 1911. It is contended by counsel for respondents, therefore, that they should be sustained on the theory that they were adopted by the superintendent, and that if he had authority to adopt them his act is not nullified by the fact that others participated with him in so doing. It was provided in section 28 of chapter 275 of the Laws of 1892, amending section 492 of chapter 410 of the Laws of 1882, among other things, the same as was subsequently provided in section 95 of the Building Code hereinbefore quoted and both further expressly provided that the superintendent of buildings should have exclusive power and authority within the city " to require the openings of hoistways or hoistway shafts, elevators and wellholes in buildings to be inclosed or secured by trap-doors, guards or gates and railings. Such guards or gates shall be kept closed at all times, except when in actual use, and the trap-doors shall be closed at the close of the business of each day by the occupant or occupants of the building having the use or control of the same." Section 95 of the Building Code was revised from the Consolidation Act as so amended by said chapter 275 of the Laws of 1892; and by a revision made March 30, 1915, section 95 became section 373, and while the provisions thereof were rearranged they were on this point adopted in the same language. (See Cosby's Code Ord. [Anno. 1915] p. 96, § 373.)* It thus appears that the building superintendent had authority to require the elevator shafts to which the statute refers to be inclosed or secured by guards or gates. This was to afford security against accidents and, therefore, I think, the superintendent was not limited to making a regulation in the general terms of the statute or Building Code,

---

* Now Building Code (1915-1916), § 374; Cosby's Code Ord. (Anno. 1917) p. 120, § 374.— [REP.

but in the interest of safety might require that the doors or gates should be closed or bolted on the shaft side so as to be opened only from within the elevator. There appears to have been some irregularity in the adoption of this regulation in that its adoption was participated in by others than the superintendent of buildings of the borough of Manhattan; but that, I think, would not destroy its effect if he adopted it or participated in its adoption. There is force, I think, in the contention that owing to the provisions of paragraph 24 such a regulation would not become binding until notice was given by the superintendent for our attention has not been drawn to any statute requiring the publication of such regulations or providing when they became effective. Surely the public are not chargeable with notice of what a building superintendent does. Moreover, there is force in the contention that the authority of the building superintendent to make such regulations is confined to uninclosed shafts, for by the preceding provision of the statute hereinbefore quoted the absolute duty of so securing the openings into elevators not inclosed in brick walls with fireproof doors is imposed without any action on the part of the superintendent. But if the proof be insufficient to show that these regulations were adopted by the superintendent of buildings or if they be not applicable, I think that would not require reversal for the reason that they are the same in effect as the regulations prescribed by the Industrial Commission which were duly adopted. The only point to either of them, so far as this case is concerned, is that they imposed the duty on the Winter Garden Company of having this door fastened from the inside, whereas on the undisputed evidence it was not so constructed, and if it had been the accident would not have happened. Since one lawful regulation unquestionably required this, the appellants could not have been prejudiced even if the court erred in charging that another regulation also required it.

The court instructed the jury that the work of making and repairing costumes as carried on by the Winter Garden Company constituted a factory within the meaning of the Labor Law. The Winter Garden Company urges its exception to this charge as a ground for reversal. I am of opinion

that the charge was proper, for the facts already stated show that it was a factory within the provisions of the Labor Law. Subdivision 4 of section 79 of the Labor Law (as amd. by Laws of 1913, chap. 202) required that " all openings leading to elevators shall be kept well lighted at all times during working hours, with artificial illumination when necessary." The court charged that this requirement applied to the Winter Garden Company and related to the room from which access to the elevator was had by this door. The accident occurred during working hours, and I am of opinion that the charge was correct, for the Winter Garden Company used the elevator to some extent and no one else used it at the third floor, and the room in which it erected the door into the elevator shaft was part of the premises leased and used by it. The broad claim is further made in behalf of the Winter Garden Company that these laws and regulations were not intended for the benefit of one occupying the position of the plaintiff at the time of the accident. It will be observed that by express terms some of the statutory provisions were enacted primarily for the benefit of those working in factories, but others show that they were intended for the benefit of all persons lawfully on the premises, and some are general and contain no special reference to the classes of persons for whose benefit they were enacted or adopted. I am of opinion that where a duty is lawfully imposed upon a master by statute, ordinance or other regulation made by legislative authority, it inures to the benefit of all his employees lawfully on the premises in the discharge of their duties.

The position of the Grant Company, however, is materially different. Its only relation to the premises, as shown by the evidence, is as Grant's assignee of the lease of the third floor after he had sublet it to the Winter Garden Company; but it evidently occupied or had business relations of some character with some or all of the remaining part of the building, for in each action it was alleged in the complaint that it operated the elevator either separately or in conjunction with Floyd Grant, and these allegations were not put in issue although the Grant Company affirmatively alleged that the Winter Garden Company had full charge and control of the third floor and the entrances, exits and approaches thereto.

Counsel for the Grant Company conceded on the argument that it occupied part of the building below and used the elevator in connection therewith, and he contended that its admission by failing to deny these allegations of the complaint should be limited to the lower part of the building. The court instructed the jury, among other things, that rule 408 adopted by the Industrial Board pursuant to the Labor Law,* which applied only to factories and factory buildings, was applicable to the Grant Company as well as to the Winter Garden Company. The Grant Company, as assignee of Grant's lease from the owner, became the landlord of the Winter Garden Company, but since the premises were not rented to the Winter Garden Company for factory purposes, it was not chargeable with knowledge as such assignee that the premises were used for factory purposes by the Winter Garden Company, and there is no evidence that it knew that they were so used prior to the accident. It is not at all clear that the provisions of the Labor Law applied to the Grant Company, which was merely an assignee of the lease of part of the building and had never been in actual possession and was only constructively in possession through its tenant, the Winter Garden Company, to which the premises had not been leased for factory purposes. It does not appear that the entire building was used for factory purposes and, therefore, it was a tenant-factory, which in section 94 of the Labor Law (as amd. by Laws of 1915, chap. 653,) is defined as a building, separate parts of which are occupied and used by different persons, companies or corporations, and one or more of which parts are so used as to constitute in law a factory. With respect to such factories that section imposes certain duties on the owner, and it defines the owner as the owner of the freehold or the lessee or joint lessees of the whole premises, or his or. her or their agent in charge of the property, and it is therein expressly provided that, excepting as otherwise prescribed in the article relating to factories, those conducting or operating the factory, whether as

---

* See Consol. Laws, chap. 31 (Laws of 1909, chap. 36), §§ 51, 52, as added by Laws of 1913, chap. 145; Id. § 79, subd. 5, as amd. by Laws of 1913, chap. 202. See. also, *ante*, p. 728, citing Labor Law, § 51a *et seq.*— [Rep.

owner or lessee of the whole or of a part of the building, shall be responsible for the observance and punishable for the non-observance of the provisions of the article, anything in any lease or agreement to the contrary notwithstanding. There is room, therefore, for the argument made by counsel for the Grant Company that the statutory provisions and the regulations of the Industrial Board or Commission made thereunder do not apply to a lessee of part of a building who is out of possession. The rule of construction applicable to these statutory provisions is stated in *Gombert* v. *McKay* (201 N. Y. 27) as follows: " The statute must be given a fair and reasonable meaning which will neither extend it beyond nor withdraw it from its intended effect." But we do not deem it necessary to decide this question, for assuming that the statute did apply to a tenant out of possession who sublet for factory purposes, it would in any event be an unreasonable construction to hold that the duty would be imposed upon such a lessee out of possession where the premises had not been rented for factory purposes and where he had no notice or knowledge that they were so used. The Grant Company by taking an assignment of the lease incurred no greater obligations than those imposed upon its assignor. At that time its assignor had parted with the possession by the lease to the Winter Garden Company, and the alterations on the third floor of the premises, which it is claimed constituted a violation of the statutory provisions and regulations made by legislative authority, were made by the Winter Garden Company after it obtained the lease from Grant. At common law it is quite clear that a lessee out of possession or the assignee of such a lessee would not be liable for changes or alterations made in the premises by the tenants. (*Ahern* v. *Steele,* 115 N. Y. 203; *Jaffe* v. *Harteau,* 56 id. 398; *Kushes* v. *Ginsberg,* 99 App. Div. 417.) The rule of liability at common law remains, excepting in so far as it has been changed by legislative enactments fairly and reasonably construed. (*Gombert* v. *McKay, supra.*) Inasmuch, therefore, as the Grant Company was not subject to the rules and regulations made by the Industrial Board or Commission, and it may have been held liable on the theory that it was, the verdict against it cannot stand.

It follows that the judgment and order should be affirmed as to the Winter Garden Company, with costs, and that on the appeal of the Grant Company the judgment and order should be reversed and a new trial granted, with costs to appellant to abide the event.

CLARKE, P. J., DOWLING, PAGE and SHEARN, JJ., concurred.

Judgments and orders affirmed, with costs as to Winter Garden Company, and on the appeal of the Grant Company, judgments and orders reversed and new trial ordered, costs to appellant to abide event.